FILED

MAY 1 1 2012

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

1
2
3
4
5
6
7

8                  **UNITED STATES DISTRICT COURT**

9                **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| IN RE: CARDTRONICS ATM FEE NOTICE LITIGATION | CASE NO. 11-MD-2245 BEN (BLM) |
| | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| Member Cases: 11-CV-0217 BEN (BLM) | [Docket No. 17] |

Member Cases: 11-CV-0217 BEN (BLM)
              11-CV-0236 BEN (BLM)
              11-CV-1203 BEN (BLM)
              11-CV-1208 BEN (BLM)
              11-CV-2813 BEN (BLM)
              11-CV-3056 BEN (BLM)
              12-CV-0559 BEN (BLM)

        Presently before the Court is a Motion for Summary Judgment by Defendants Cardtronics USA, Inc. and Cardtronics, Inc. (collectively, "Cardtronics"). (Docket No. 17.) For the reasons stated below, summary judgment in favor of Cardtronics is **GRANTED** in member cases *Sandoval v. Cardtronics USA, Inc.*, 11-CV-0217 BEN (BLM); *Christensen v. Cardtronics USA, Inc.*, 11-CV-0236 BEN (BLM); *Johnson v. Target Corporation*, 11-CV-1203 BEN (BLM); and *Johnson v. Target Stores, Inc.*, 11-CV-1208 BEN (BLM).

                              **BACKGROUND**

**I.     PROCEDURAL BACKGROUND**

        This consolidated action arises from nine separate lawsuits originally filed in Alabama, California, Illinois, Mississippi, Tennessee, and Texas. The Judicial Panel on Multidistrict Litigation consolidated the actions because of the extensive factual and legal overlap of each case. *See In re*

1    *Cardtronics ATM Fee Notice Litig.*, MDL No. 2245, 2011 WL 2118999, at *1 (J.P.M.L. May 26,

2    2011).

3         Cardtronics moves for summary judgment on four of the member cases that are included in this

4    multidistrict proceeding—*Sandoval v. Cardtronics USA, Inc.*, 11-CV-0217 BEN (BLM); *Christensen*

5    *v. Cardtronics USA, Inc.*, 11-CV-0236 BEN (BLM); *Johnson v. Target Corporation*, 11-CV-1203

6    BEN (BLM); and *Johnson v. Target Stores, Inc.*, 11-CV-1208 BEN (BLM).  Being fully briefed, the

7    Court finds the Motion suitable for determination on the papers without oral argument, pursuant to

8    Civil Local Rule 7.1.d.1.

9         **II.    FACTUAL BACKGROUND**

10             **A.    Cardtronics' Policies and Procedures**

11        Cardtronics owns and operates over 45,000 ATMs across the United States.  (Statement of

12   Material Facts ("SMF") [Docket No. 17-2] ¶ 1.)  Cardtronics maintains a policy to ensure that posted

13   notices, called "Network Decals," are attached to its ATMs.  (*Id.* ¶ 4.)  The Network Decals serve two

14   purposes: (1) to provide a fee notice, and (2) to list the participating ATM networks that can be

15   accessed using the ATM.  (*Id.* ¶¶ 6-8.)  The Network Decals are attached to the ATMs using a strong

16   epoxy, which is applied to a sticker made from polycarbonate. (*Id.* ¶¶ 52-53.)  The sticker has a strong

17   adhesive backing that will likely not become detached from the ATM without human intervention.

18   (*Id.* ¶ 52.)

19        All ATMs owned by Cardtronics are brought to Cardtronics' warehouse in Houston, Texas,

20   for pre-installation programming, configuration, and set-up ("staging").  (*Id.* ¶¶ 9-10.)  A standard

21   form, titled "Cardtronics Prep/Re-Furb Work Order," lists the possible staging tasks that may be

22   required for an ATM.  (*Id.* ¶¶ 12-13.)  A Cardtronics employee in the Program Management team

23   reviews the bill of material and the specifications of the customer that will house the ATM, then

24   customizes the Work Order to include the proper components, quantity numbers, and model numbers.

25   (*Id.* ¶¶ 14-15.)  Every Work Order that is generated requires that a Network Decal be placed on the

26   ATM. (*Id.* ¶ 16.)

27        Next, the Work Order is sent to a technician at the Cardtronics warehouse.  (*Id.* ¶ 17.)  The

28   technician uses the Work Order as a roadmap for what features are required for the ATM, and makes

1    changes to the ATM accordingly. (*Id.* ¶ 18.) Another Cardtronics employee, typically the shipping

2    and receiving clerk, will check off that the required tasks have been completed on the Work Order

3    before the ATM is shipped out. (*Id.* ¶ 19.)

4         After the ATM is staged, it is shipped to its permanent location for installation. (*Id.* ¶ 21.)

5    Cardtronics uses third-party vendors to install the ATMs on-site. (*Id.* ¶ 22.) The installation vendors

6    must use a standard Cardtronics form titled "Installation Authorization" as a checklist during

7    installation. (*Id.* ¶ 23.) The Installation Authorization contains a section relating to "Installation

8    Details," which asks the technician whether the Network Decal has been applied to the ATM. (*Id.*

9    ¶¶ 24-25.) The Installation Authorization also asks whether the technician has taken a picture of the

10   installed ATM. (*Id.* ¶ 27.)

11        The vendor then sends the completed Installation Authorization and pictures to Cardtronics

12   with its invoice for payment. (*Id.* ¶ 28.) Once the materials are received, the Merchant Scheduling

13   team reviews the form for completeness and for any discrepancies with the ATM. (*Id.* ¶ 29.) If there

14   is a problem, the Cardtronics employee works with the vendor to fix the problem. (*Id.* ¶ 30.) For

15   instance, if the Network Decal is missing, Cardtronics sends a Network Decal to the vendor to be

16   applied to the ATM. (*Id.* ¶ 31.)

17        If the ATM is owned by an independent store but will be operated under contract by

18   Cardtronics, a similar process is used. The staging process does not occur in the Cardtronics

19   warehouse, but rather, the ATM is shipped directly from the manufacturer to the installation site. (*Id.*

20   ¶¶ 32-33.) Cardtronics sends the third-party vendor the materials that would have been used during

21   the staging process, including the Network Decal. (*Id.* ¶ 34.) The vendor then stages and installs the

22   ATM, using the Installation Authorization form. (*Id.* ¶¶ 35-36.)

23        If an existing ATM is replaced, Cardtronics uses different terminology for the on-site process.

24   Instead of referring to "installation," Cardtronics refers to "reprogram." (*Id.* ¶ 37.) The ATM that is

25   already on-site is reprogrammed using the same basic process that is followed in the Cardtronics

26   warehouse. (*Id.* ¶ 39.) Cardtronics sends a Network Decal to the third-party vendor for application

27   to the ATM. (*Id.* ¶ 40.) The technician performing the on-site reprogram uses a form titled

28   "Reprogram Authorization." (*Id.* ¶ 41.) The relevant portions of the Reprogram Authorization are

11md2245

1    similar to the Installation Authorization, but use different terminology. (*Id.*)  The Reprogram

2    Authorization asks whether the "Surcharge/Network decal" has been applied. (*Id.* ¶ 42.)  In addition,

3    the Reprogram Authorization asks the technician to take a picture of the installed ATM. (*Id.* ¶ 43.)

4            When Cardtronics dispatches vendors to ATMs for repair, maintenance, or cash replacement,

5    Cardtronics instructs its vendors to only complete the work authorized by Cardtronics. (*Id.* ¶ 55.)

6    Cardtronics does not instruct its vendors to remove the Network Decals, except where a new one is

7    provided to replace an older one. (*Id.* ¶ 56.)

8            Cardtronics stores electronic documentation for its ATMs in Doclink, a database system. (*Id.*

9    ¶ 60.)  After an ATM's installation documentation is reviewed by a Cardtronics employee, the

10   documents are added to Doclink using an identifying "Terminal ID" or "TID" for the ATM. (*Id.*

11   ¶¶ 60-61.)  Cardtronics attempts to include photographs of the ATMs at installation with the

12   documentation. (*Id.* ¶ 62.)  In addition, documents from the Cardtronics warehouse, such as Work

13   Orders, are scanned and saved into the warehouse server under the Terminal ID for the ATM. (*Id.* ¶¶

14   63-64.) Moreover, Cardtronics documents all changes made to an ATM in the field. (*Id.* ¶ 65.)  If any

15   work is done to an ATM, including if the Network Decal is changed or removed, a ticket that specifies

16   the change to be made to the ATM will be electronically generated. (*Id.* ¶¶ 66-67.)  The ticket is then

17   stored in the Cardtronics system and is retrievable by the Terminal ID. (*Id.* ¶ 68.)  The only exception

18   to this procedure is for large-scale changes made to Cardtronics' fleet of ATMs. (*Id.* ¶ 69.)  Such

19   large-scale changes are documented using a spreadsheet. (*Id.* ¶¶ 69-70.)

20           Cardtronics' procedures for ensuring that Network Decals are affixed to its ATMs are highly

21   successful.  Cardtronics is currently auditing its ATMs in order to place Braille instructions on each

22   ATM. (*Id.* ¶ 44.)  As part of this process, Cardtronics has instructed its vendors to check whether the

23   ATMs have Network Decals, and to identify those with missing Network Decals so that Cardtronics

24   can place new ones on those ATMs. (*Id.* ¶¶ 47-48.)  Of the 8,877 ATMs that Cardtronics has visited,

25   87 were missing Network Decals. (*Id.* ¶ 49.)  In other words, over 99% of the ATMs had Network

26   Decals. (*Id.* ¶ 50.)

27   ///

28   ///

11md2245

**B.    Individual ATMs at Issue in the Present Action**

In the four lawsuits relevant here, a total of six ATMs are at issue.  Each of these ATMs will be addressed in turn.

*i.    ATM at Vons Store in San Diego, California (Sandoval Action)*

The ATM at issue in the *Sandoval* action is located at a Vons store in San Diego, California ("San Diego ATM"). (*Id.* ¶ 71.)  The Work Order generated for this ATM indicates that the task of applying a Network Decal to the ATM was checked off as accomplished. (*Id.* ¶ 72.)  The completed Reprogram Authorization, dated January 2008, indicates that the Network Decal was on the ATM at the time it was reprogrammed. (*Id.* ¶ 73.)  In addition, Cardtronics has pictures taken by the technician after the reprogram, which show the Network Decal affixed to the ATM below the cash dispenser. (*Id.* ¶ 74.)  Cardtronics does not have any record of removing the Network Decal, or any record of instructing a vendor to remove the Network Decal. (*Id.* ¶ 75.)

*ii.    ATM at Costco Store in Temecula, California (Christensen Action)*

One of the two ATMs at issue in the *Christensen* action is located at a Costco store in Temecula, California ("Temecula ATM"). (*Id.* ¶ 76.)  The Installation Authorization for this ATM, dated March 2007, indicates that the Network Decal was on the ATM at the time of installation. (*Id.* ¶ 77.)  In addition, Cardtronics has pictures taken by the technician after installation, which show the Network Decal below the cash dispenser. (*Id.* ¶ 78.)  Moreover, Cardtronics had pictures of the ATM taken in 2011, which show white residue on the ATM, where the Network Decal had previously been. (*Id.* ¶ 79.)  Cardtronics has no record of removing the Network Decal, nor any record of instructing a vendor to remove the Network Decal. (*Id.* ¶ 80.)

*iii.    ATM at Costco Store in Vista, California (Christensen Action)*

The other ATM at issue in the *Christensen* action is located at a Costco store in Vista, California ("Vista ATM"). (*Id.* ¶ 81.)  The Work Order for this ATM, dated December 2008, indicates that a Network Decal was applied. (*Id.* ¶ 82.)  Pictures of this ATM, taken in January 2011, show white residue on the ATM where the Network Decal had previously been. (*Id.* ¶ 83.)  Cardtronics has no record of removing the Network Decal, nor any record of instructing a vendor to remove the Network Decal. (*Id.* ¶ 84.)

1                     *iv.     ATM at Target Store in Memphis, Tennessee (*Johnson *Action)*

2        The first ATM at issue in the *Johnson*-Tennessee action is located at a Target store in

3 Memphis, Tennessee ("Memphis ATM"). (*Id.* ¶ 85.) The Installation Authorization for this ATM,

4 dated September 2005, states that the Network Decal was on the ATM at the time of installation. (*Id.*

5 ¶ 86.) Cardtronics has no record of removing the Network Decal, nor any record of instructing a

6 vendor to remove the Network Decal. (*Id.* ¶ 87.)

7                     *v.     ATM at Target Store in Germantown, Tennessee (*Johnson *Action)*

8        The second ATM at issue in the *Johnson*-Tennessee action is located at a Target store in

9 Germantown, Tennessee ("Germantown ATM"). (*Id.* ¶ 91.) Cardtronics acquired this ATM from

10 E*Trade Access, in a 2004 corporate transaction. (*Id.* ¶ 92.) Cardtronics does not possess the

11 installation records for this ATM. (*See id.*) However, Cardtronics sent third-party vendors to each of

12 the ATMs acquired from E*Trade within 90 days of the acquisition in order to make changes to the

13 ATM processor. (*Id.* ¶ 93.) These processor changes were essential for Cardtronics to operate the

14 ATMs. (*Id.*) The vendors applied the Network Decals at the same time that they made the processor

15 changes. (*Id.* ¶ 94.) Cardtronics has been unable to locate documentation for the Germantown ATM

16 from the relevant time period, as the work was done before Cardtronics began to use Docklink and

17 documentation was kept in paper form. (*Id.* ¶ 96.) Cardtronics has no record of removing the Network

18 Decal from the ATM, nor any record of instructing a vendor to remove the Network Decal. (*Id.* ¶ 97.)

19                    *vi.     ATM at Target Store in Olive Branch, Mississippi (*Johnson *Action)*

20        The ATM at issue in the *Johnson*-Mississippi action is located at a Target store in Olive

21 Branch, Mississippi ("Olive Branch ATM"). (*Id.* ¶ 88.) The Work Order for this ATM, dated June

22 2008, indicates that a Network Decal was applied to the ATM. (*Id.* ¶ 89.) Cardtronics has no record

23 of removing the Network Decal, nor any record of instructing a vendor to remove the Network Decal.

24 (*Id.* ¶ 90.) Photographs taken in July 2010 show that no Network Decal is present, and no sticker

25 residue is present. (Johnson Opp. [Docket No. 38], Exh. A.)

26                                     **DISCUSSION**

27        Summary judgment must be granted where the record shows "there is no genuine dispute as

28 to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a);

11md2245

1   *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "persuade the

2   court that there is no genuine issue of material fact." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,*

3   *Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  When the moving party satisfies this burden, the

4   nonmoving party must go beyond the pleadings to demonstrate specific material facts that give rise

5   to a genuine issue. *Celotex Corp.*, 477 U.S. at 324.  "These principles apply equally whether summary

6   judgment is granted on the merits of the claim, or on an affirmative defense." *Buttry v. Gen. Signal*

7   *Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995); *see also Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507,

8   1514 (9th Cir. 1994).

9          The Electronic Fund Transfer Act ("EFTA") governs many types of electronic fund transfers,

10   including ATM transfers.  *See* 15 U.S.C. § 1693a(7).  The EFTA "require[s] any automated teller

11   machine operator who imposes a fee on any consumer for providing host transfer services to such

12   consumer to provide notice in accordance with subparagraph (B) to the consumer (at the time the

13   service is provided) of—(i) the fact that a fee is imposed by such operator for providing the service;

14   and (ii) the amount of any such fee." 15 U.S.C. § 1693b(d)(3)(A); *see also* 12 C.F.R. 205.16(b).

15   Subparagraph B requires that notice be provided both on the machine and on the screen.  15 U.S.C.

16   § 1693b(d)(3)(B); *see also* 12 C.F.R. § 205.16(c).  The notice on the machine must state either that

17   (1) a fee *will* be imposed, or (2) if there are circumstances in which a fee will not be imposed, that a

18   fee *may* be imposed.  12 C.F.R. § 205.16(c).  No fee may be imposed unless these notice requirements

19   are met.  15 U.S.C. § 1693b(d)(3)(C); 12 C.F.R. § 205.16(e).  Customers may recover statutory

20   damages under the EFTA.  15 U.S.C. § 1693m(a).

21          Cardtronics does not dispute that the ATMs at issue here charged customers a fee, that it was

22   required to post fee notices on its ATMs, or that such fee notices were missing from the ATMs.

23   Rather, Cardtronics argues that it is shielded from liability under two affirmative defenses: the bona

24   fide error defense and the safe harbor defense.

25   **I.     BONA FIDE ERROR DEFENSE**

26          The bona fide error defense is applicable to the Germantown ATM, for which there is no

27   evidence that a fee notice was affixed to the ATM.  The bona fide error defense provides that "a person

28   may not be held liable . . . if the person shows by a preponderance of evidence that the violation was

1    not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures

2    reasonably adapted to avoid any such error." 15 U.S.C. § 1693m(c).  Under § 1693m(c), therefore,

3    a defendant is not liable for a missing ATM fee notice if: (1) the defendant maintained "procedures

4    reasonably adopted to avoid" a missing notice; and (2) the lack of a notice was "not intentional," but

5    was a "bona fide error."

6        First, there is no genuine dispute that Cardtronics maintains procedures reasonably adapted to

7    avoid missing fee notices on its ATMs.  Cardtronics has a policy to place a Network Decal on each

8    of its ATMs.  As discussed above, Cardtronics has implemented a multi-layered, redundant process

9    to attach a Network Decal to each new ATM that it installs.  A Cardtronics employee first applies the

10   Network Decal to the ATM, following a customized Work Order.  A separate Cardtronics employee

11   confirms and documents that the required staging tasks, such as applying the Network Decal, have

12   been completed before shipping the ATM.  A third-party technician who installs the ATM on-site is

13   required to follow a Cardtronics form that asks whether the Network Decal is affixed to the ATM.

14   Finally, the technician takes a picture of the ATM, confirming that the Network Decal is in place.  This

15   procedure is highly effective.  As discussed above, Cardtronics has found that over 99% of its ATMs

16   have Network Decals in its ongoing audit of their ATMs.  *See Puglisi v. Debt Recovery Solutions,*

17   *LLC*, 822 F. Supp. 2d 218, 226-27 (E.D.N.Y. 2011) ("[W]hen attempting to show that he is entitled

18   to the bona fide error defense, a debt collector need not demonstrate that its procedures for avoiding

19   FDCPA violations are fool proof, but rather, must only show that its procedures constitute a reasonable

20   precaution." (internal quotation marks and alteration omitted)).[1]

21       Second, Cardtronics has offered evidence to support the conclusion that any missing notices

22   are not intentional, but bona fide errors.  Cardtronics intends that each ATM have a Network Decal,

23   and employs procedures designed to ensure that the ATMs will in fact have Network Decals. (*See*

24   SMF ¶ 51.) Because the Network Decals identify the ATM networks that can be accessed at the ATM,

25   Cardtronics has a strong business incentive to attach the Network Decals to the ATMs in order to

26   _____

27       [1] The case law under the Federal Debt Collection Practices Act ("FDCPA") is relevant to interpreting the EFTA because (1) the FDCPA uses the same language for its bona fide error defense
28   as does the EFTA, and (2) the two statutes are next to each other in the Code.  *See Johnson v. W. Suburban Bank*, 225 F.3d 366, 378-79 (3d Cir. 2000); *Blackburn v. FEDCorp, Inc.*, No. 10-cv-726, 2011 WL 1807631, at *4 (M.D. Ala. May 11, 2011).

11md2245

1   increase use of the ATM. (*Id.* ¶¶ 7-8.) There is no evidence that Cardtronics removes the Network

2   Decals without replacing them, and because the Network Decals are attached to the ATMs with a

3   strong epoxy, they will likely not fall off on their own. (*Id.* ¶¶ 52-53.)

4        Plaintiffs have not offered evidence to rebut these facts. Accordingly, Cardtronics is shielded

5   from liability by the bona fide error defense in regards to the Germantown ATM. *See Lewis v. ACB*

6   *Bus. Servs., Inc.*, 135 F.3d 389, 401-02 (6th Cir. 1998) (granting summary judgment for defendant

7   where plaintiff failed to rebut defendant's showing that error was unintentional).

8        ## II.   SAFE HARBOR DEFENSE

9        The safe harbor defense is applicable to the San Diego, Temecula, Vista, Memphis, and Olive

10  Branch ATMs, for which there is evidence that a fee notice was originally affixed to the ATMs. The

11  safe harbor defense provides: "If the notice required to be posted pursuant to section 1693b(d)(3)(B)(i)

12  of this title by an automated teller machine operator has been posted by such operator in compliance

13  with such section and the notice is subsequently removed, damaged, or altered by any person other

14  than the operator of the automated teller machine, the operator shall have no liability under this section

15  for failure to comply with section 1693b(d)(3)(B)(i) of this title." 15 U.S.C. § 1693h(d).

16       The business records for the San Diego, Temecula, Vista, Memphis, and Olive Branch ATMs

17  establish that Cardtronics applied the required fee notices to each of these machines. In addition,

18  Cardtronics did not remove the Network Decals. Cardtronics documents the changes it makes to its

19  ATMs, and has no record of removing the Network Decals on any of the ATMs at issue here.

20  Cardtronics does not typically require that the Network Decals be removed and updated with new ones.

21  (SMF ¶ 54.) Cardtronics also documents changes made by its vendors, and has no record of its

22  vendors removing the Network Decals from the ATMs at issue. Through this undisputed evidence,

23  Cardtronics has established that the Network Decals were removed by a third-party. *See Piontek v.*

24  *Penn Sec. Bank & Trust Co.*, No. 10-cv-1038, 2011 WL 1002194, at *4 (M.D. Pa. Jan. 31, 2011)

25  (photographs and affidavit stating that no one in the company would have removed the on-machine

26  notice adequately established a defense under § 1693h(d)).

27       Plaintiffs have not offered evidence to rebut these facts. Accordingly, Cardtronics is shielded

28  from liability by the safe harbor defense in regards to the San Diego, Temecula, Vista, Memphis, and

11md2245

1  Olive Branch ATMs.  *See Piontek*, 2011 WL 1002194, at \*4 (granting summary judgment on safe

2  harbor defense to an ATM operator where "defendant's affidavit and photos tend to show that the

3  required external notice was posted on the ATM in question and that the notice was removed by some

4  third party").

5  **III.   JOHNSON'S OPPOSITION**

6  Plaintiff Sheryl Johnson argues that neither the bona fide error defense nor the safe harbor

7  defense applies here.  In regards to the bona fide error defense, Johnson first argues that this defense

8  does not apply to missing ATM fee notices because a missing ATM notice is not a clerical error.  A

9  "clerical error" is the failure of a subordinate employee, given no discretion in his function, to follow

10  his employer's instructions.  *Ford Motor Co. v. United States*, 157 F.3d 849, 860 (Fed. Cir. 1998)

11  (clerical error requires that "a subordinate is given binding instructions on particular aspects of a task,

12  no duty devolves upon him to exercise discretion or judgment in carrying out those aspects").  Here,

13  Cardtronics has mandatory procedures that requires its employees and vendors to apply Network

14  Decals to the ATMs, and its employees and vendors have no discretion in carrying out this function.

15  Thus, any failure to initially place Network Decals on the ATMs at issue were clerical errors.

16  Second, Johnson argues that because the definition of "error" in Regulation E, 12 C.F.R.

17  § 205.11(a),[2] does not list the failure to post a fee notice on the exterior of an ATM and such a failure

18  is not analogous to any of the types of errors listed, the failure to post a fee notice is not an error.

19  Regulation E, however, is inapplicable here.  The definition of "error" in Section 205.11 is used only

---

[2] Section 205.11(a) defines error as:

(i) An unauthorized electronic fund transfer;
(ii) An incorrect electronic fund transfer to or from the consumer's account;
(iii) The omission of an electronic fund transfer from a periodic statement;
(iv) A computational or bookkeeping error made by the financial institution relating to an electronic fund transfer;
(v) The consumer's receipt of an incorrect amount of money from an electronic terminal;
(vi) An electronic fund transfer not identified in accordance with §§ 205.9 or 205.10(a); or
(vii) The consumer's request for documentation required by §§ 205.9 or 205.10(a) or for additional information or clarification concerning an electronic fund transfer, including a request the consumer makes to determine whether an error exists under paragraphs (a)(1)(i) through (vi) of this section.

- 10 -

11md2245

1  in that section, which concerns a consumer's complaint to a financial institution about "errors" in a

2  particular fund's transfer.  Regulation E does not addresses the "bona fide error" defense.

3      Third, Johnson cites *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S.Ct.

4  1605, 1624 (2010), for the proposition that the bona fide error defense is inapplicable to mistakes of

5  law. *Jerman* is inapposite here, as a missing fee notice in these circumstances is not a mistake of law.

6      Fourth, Johnson argues that a defendant must show with "reasonable certainty" how the error

7  occurred, citing an ALR article.[3]  Courts, however, have held otherwise.  *See Mirabal v. Gen. Motors*

8  *Acceptance Corp.*, 537 F.2d 871, 877 n.8 (7th Cir. 1976), *overruled on other grounds by Brown v.*

9  *Marquette Sav. & Loan Ass'n*, 686 F.2d 608 (7th Cir. 1982); *Thomas v. Boscia*, No. 08-cv-42, 2009

10  WL 2778105, at *4 (S.D. Ind. Aug. 28, 2009) (holding that "even though the [defendant] is unable to

11  explain the exact cause of the failure of its procedures in this case, the Court does not deem that fatal

12  to the [bona fide error] defense.").

13      Fifth, Johnson argues that if a third party removed the Network Decal, this intentional act could

14  not be considered an error or mistake by Cardtronics.  This argument conflates the bona fide error

15  defense with the safe harbor defense.  The bona fide error defense applies when Cardtronics cannot

16  prove that it affixed a fee notice to an ATM; the safe harbor defense applies when a third party

17  removed a fee notice from an ATM.

18      Sixth, Johnson argues that because Section 1693m(c) requires a defendant to "maintain"

19  procedures reasonably adapted to prevent the error at issue, Cardtronics was required to have in place

20  an ongoing procedure to prevent missing fee notices over time, citing *Holsinger v. Wolpoff &*

21  *Abramson LLP*, No. C 05-02075, 2006 WL 2092632, at *5-6 (N.D. Cal. July 27, 2006).  According

22  to Johnson, Cardtronics was required to maintain a procedure reasonably adapted to prevent the notices

23  from being removed or damaged, which would include a procedure to regularly inspect the ATMs and

24  replace missing notices.   Johnson's argument, however, misconstrues the meaning of the term

25  "maintenance."  As the Seventh Circuit explained, "maintenance" "means that . . . the proper

26

27      [3] James Lockhart, Annotation, *What Constitutes Truth in Lending Act Violation Which "Was*

28  *Not Intentional and Resulted From Bona Fide Error Notwithstanding Maintenance of Procedures*
   *Reasonably Adapted to Avoid Any Such Error" Within Meaning of § 130(c) of Act (15 U.S.C.A. §*
   *1640(c))*, 153 A.L.R. Fed. 193 (1999).

11md2245

1    procedures were followed time in and time out." *Mirabal*, 537 F.2d at 879.  Moreover, *Holsinger* in

2    fact stands for the proposition that a re-checking mechanism, satisfied by having more than one

3    individual involved in review, is required.  2006 WL 2092632, at *5-6.  As explained above,

4    Cardtronics regularly followed its procedure to affix Network Decals to its ATMs through the staging

5    and installation processes.  In addition, this procedure involved multiple employees ensuring that the

6    Network Decals were affixed to the ATMs.

7            In regards to the safe harbor defense, Johnson argues that in order to prevail, Cardtronics must

8    present affirmative evidence that a third party removed the notice, citing *Boecherer v. Burling Bank*,

9    No. 08 C 1332, 2009 WL 4544695 (N.D. Ill. Dec. 1, 2009), and *Drager v. Bridgeview Bank*, No. 10-

10   cv-7585, 2011 WL 2415244 (N.D. Ill. June 13, 2011).  On the contrary, courts applying the "safe

11   harbor" defense do not demand that ATM operators prove the specific circumstances of the removal

12   of the notice; rather they allow the ATM operator to prove that it did not remove the notice itself,

13   leaving a sufficiently reasonable inference that someone else must have removed it.  *See Reyes v. Cole*

14   *Taylor Bank*, No. 10-cv-2181, 2011 WL 3704705, at *3-4 (N.D. Ill. Aug. 22, 2011); *Piontek*, 2011 WL

15   1002194, at *4.  Here, as explained above, there is no evidence that Cardtronics removed the notice

16   itself, leaving a sufficiently reasonable inference that someone else must have removed it.

17           In addition, Johnson's authorities are inapposite.  In *Boecherer*, the court held that it was not

18   a reasonable inference that a third party removed the notice because the notice was attached to the

19   ATM with "double-sided tape," and there was evidence that the notice fell off on its own.  2009 WL

20   4544695, at *2, *6 (on "several occasions" the notice was "on the floor in front of the ATM").  In the

21   present case, however, Cardtronics used a strong epoxy to attach the Network Decals, so the Network

22   Decals would not have fallen off on their own.  In *Drager*, while ruling on a motion for judgment on

23   the pleadings under Rule 12(c), the court held that discovery must be conducted before the court ruled

24   on the safe harbor defense.  2011 WL 2415244, at *8.  The court declined to address whether a

25   defendant could establish the safe harbor defense by showing that it posted the notice and did not

26   remove it.  *Id.* at *8 n.7.

27           Accordingly, Cardtronics' motion for summary judgment against Johnson is **GRANTED** in

28   member cases *Johnson v. Target Corporation*, 11-CV-1203 BEN (BLM), and *Johnson v. Target*

11md2245

1 | *Stores, Inc.*, 11-CV-1208 BEN (BLM).

2 | **IV.   CHRISTENSEN'S AND SANDOVAL'S OPPOSITION**

3 | Plaintiffs Gini Christensen and Joshua Sandoval do not address Cardtronics' arguments on

4 | their merits. Rather, Christensen and Sandoval make a procedural request under Federal Rule of Civil

5 | Procedure 56(d) for additional discovery to support their opposition.

6 | The Scheduling Order established that the first phase of discovery in the instant action had to

7 | be completed on or before January 6, 2012. (Scheduling Order [Docket No. 2], at 3 ¶ 6.) It required

8 | that all discovery be served in time so that responses would be due by January 6, 2012. (*Id.*) Written

9 | discovery therefore had to be served by December 7, 2011. (*See id.*) On December 8, 2011,

10 | Christensen and Sandoval served Cardtronics with Plaintiffs' First Set of Interrogatories and First

11 | Request for Production of Documents. (Golovach Decl.[Docket No. 40-1] ¶ 3.) On January 9, 2012,

12 | Cardtronics served its responses to Christensen's and Sandoval's written discovery. (*Id.* ¶ 4.) In

13 | response to each of the interrogatories and document requests, Cardtronics claimed that Christensen's

14 | and Sandoval's written discovery "was untimely served pursuant to paragraph 6 of the Case

15 | Management Conference Order Regulating Discovery And Other Pretrial Proceedings (Dkt. 2), and

16 | that no response is therefore required." (*Id.*)

17 | Christensen and Sandoval argue that because Cardtronics has not provided substantive

18 | responses to their written discovery requests, they are unable to "present facts essential to justify the

19 | opposition to the Motion." (Christensen & Sandoval Opp. [Docket No. 40], at 2.) Christensen and

20 | Sandoval argue that the Court should grant them relief pursuant to Rule 56(d) ("If a nonmovant shows

21 | by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its

22 | opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain

23 | affidavits or declarations or to take discovery; or (3) issue any other appropriate order."). In addition,

24 | they argue that their written discovery was untimely because of a calendaring error, and such a

25 | calendaring mistake falls within the parameters contemplated by Federal Rule of Civil Procedure

26 | 60(b)(1).

27 | As explained above, the Scheduling Order established that the first phase of discovery in the

28 | instant action had to be completed on or before January 6, 2012. Under Federal Rule of Civil

11md2245

1   Procedure 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent."

2   Therefore, a party must demonstrate "good cause" for an extension of discovery. FED. R. CIV. P.

3   16(b)(4); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). Plaintiffs' failure to

4   conduct discovery is not a "good cause" to allow more time for discovery, especially where discovery

5   closed two months earlier. *Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*,

6   No. 10-cv-0677, 2011 WL 455896, at *1-2 (S.D. Cal. Feb. 1, 2011) (no good cause where party sought

7   relief approximately one month after close of discovery); *Justin v. City & Cnty. of San Francisco*, No.

8   C 05-4812, 2008 WL 544466, at *3-4 (N.D. Cal. Feb. 26, 2008) (no good cause where plaintiffs

9   waited until end of discovery to seek depositions and delayed in seeking extension of discovery

10  period).

11       In addition, Plaintiffs failed to timely move to compel Cardtronics to respond to their discovery

12  requests. According to the Scheduling Order, any motion to compel was required to be filed by

13  February 6, 2012. (Scheduling Order [Docket No. 2], at 3 ¶ 6 ("In addition, all discovery motions

14  must be filed within thirty (30) days after the close of discovery.").) Plaintiffs, however, did not

15  request that additional discovery be conducted until they filed their opposition brief on March 5, 2012,

16  a month after the deadline had passed. Their failure to move to compel Cardtronics' discovery

17  responses is a lack of diligence that bars their claim under Rule 56(d). *See Bank of Am., NT & SA v.*

18  *PENGWIN*, 175 F.3d 1109, 1117-18 (9th Cir. 1999) (party's failure to timely move to compel

19  discovery, despite knowing about other party's refusal to produce documents, was grounds to not allow

20  additional discovery under Rule 56(f)).[4]

21       Christensen's and Sandoval's request for relief under Rule 56(d) fails for several reasons.

22  First, Plaintiffs must make a motion under Rule 56(d) for a continuance and for leave to conduct

23  additional discovery; they may not raise a request for relief under Rule 56(d) in an opposition brief.

24  *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986) ("References in

25  memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f). Rule

26

27  _____

    [4] Rule 56(d) was formerly Rule 56(f). "Subdivision (d) carries forward without substantial
28  change the provisions of former subdivision (f)." FED. R. CIV. P. 56, Committee Notes on
    Rules—2010 Amendment. Precedent under Rule 56(f) applies to Rule 56(d). *See Roberts v. McAfee,*
    *Inc.*, 660 F.3d 1156, 1169 (9th Cir. 2011).

- 14 -

11md2245

56(f) requires affidavits setting forth the particular facts expected from the movant's discovery. Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment."); *see also Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001) (affirming denial of Rule 56(f) request and finding that inclusion of request in opposition brief was "plainly inadequate"). Here, Plaintiffs have not made a motion for a continuance or for leave to conduct additional discovery, but rather refer to the need for additional discovery in their opposition to Cardtronics' Motion for Summary Judgment.

Second, a party may only be granted relief under Rule 56(d) if the party has previously been diligent in conducting discovery. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006) (affirming denial of former Rule 56(f) request because "plaintiff's prior discovery efforts were not diligent"). Here, Christensen and Sandoval have not been diligent, as they have not timely served discovery. As explained above, the Scheduling Order required that all written discovery be served by December 7, 2011, in order for responses to be due by January 6, 2012. Although Plaintiffs had seven months to serve discovery requests, Plaintiffs did not serve written discovery until December 8, 2011, a day after the deadline. Because Plaintiffs have failed to take discovery, they may not request additional discovery. *Brae Transp.*, 790 F.2d at 1443 ("Having taken no discovery, [plaintiff] can hardly argue at this late date that the district court abused its discretion in ruling on the summary judgment in light of the fact that [plaintiff] itself failed to pursue the procedural remedy which the Federal Rules so clearly provided." (internal quotation marks omitted).)

In regards to Christensen's and Sandoval's invocation of Rule 60(b)(1), Rule 60 does not apply here. Rather, Rule 60 applies to a "final judgment, order, or proceeding." *See* FED. R. CIV. P. 60(b) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect."); *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1260 (9th Cir. 2010). The applicable rule here is Rule 16, as discussed above. *See Hoffman v. Tonnemacher*, No. CIV F 04-5714, 2007 WL 2318099, at *1 n.1 (E.D. Cal. Aug. 10, 2007) (request to modify pre-trial order should be brought under Rule 16, rather than Rule 60(b)).

11md2245

1    Lastly, Christensen and Sandoval incorporate the arguments made by Johnson in her

2  opposition.  As explained above, these arguments fail.

3    Accordingly, Cardtronics' motion for summary judgment against Christensen and Sandoval

4  is **GRANTED** in member cases *Sandoval v. Cardtronics USA, Inc.*, 11-CV-0217 BEN (BLM), and

5  *Christensen v. Cardtronics USA, Inc.*, 11-CV-0236 BEN (BLM).

6                                         **CONCLUSION**

7

8    For the reasons set forth above, summary judgment in favor of Cardtronics is **GRANTED** in

9  member cases *Sandoval v. Cardtronics USA, Inc.*, 11-CV-0217 BEN (BLM); *Christensen v.*

10  *Cardtronics USA, Inc.*, 11-CV-0236 BEN (BLM); *Johnson v. Target Corporation*, 11-CV-1203 BEN

11  (BLM); and *Johnson v. Target Stores, Inc.*, 11-CV-1208 BEN (BLM).

12    **IT IS SO ORDERED.**

13  DATED: May// , 2012

14                                              HON. ROGER T. BENITEZ
                                               United States District Court Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

11md2245